UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LANCE MORRIS, | : | |
|     Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3-06CV392 (JCH) |
| v. | : | |
| | : | |
| ARMANDO VALERIANO, JON W. BRIGHTHAUPT, ROBERTO QUIROS, JOSE MORALES, and JAMES POLLARD, | : | |
|     Defendants. | : | JUNE 25, 2007 |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. No. 28]**

**I.   INTRODUCTION**

The plaintiff, Lance Morris, an employee of the Connecticut Department of Correction ("DOC"), brings an action against the defendants Armando Valeriano, Jon W. Brighthaupt, Roberto Quiros, Jose Morales, and James Pollard, in their individual capacities (collectively, "defendants"). Morris alleges the defendants violated his Fourth Amendment right to be free of unreasonable searches and seizures.

The defendants have filed a Motion for Summary Judgment [Doc. No. 28] pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**II.   STANDARD OF REVIEW**

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts

1

showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.    FACTUAL BACKGROUND[1]

Lance Morris has been employed with the Department of Correction ("DOC"), working at Garner Correctional Institution ("Garner") in Newtown, CT, for approximately fifteen years. See Def.'s Loc.R.Civ.P. 56(a)1 Statement ("Def.'s Stat.") at ¶¶ 1, 66 [Doc. No. 28]. Each of the defendants is also a DOC employee, working in the DOC Security Division, which is responsible for investigating allegations of misconduct by DOC staff. Id. at ¶¶ 2-3.

Speed-dial telephone numbers are set up at various DOC facilities, so that select inmates can inform correctional staff about security issues. Id. at ¶ 5. On May 17,

---

[1] For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is evidence to support his allegations.

2004, Correctional Officer Pollard was assigned to conduct a routine audit of the speed-dial system for all DOC facilities. Id. at ¶ 6. Pollard's audit found a higher than average volume of calls made from inmate phones at Garner to one particular speed-dial number, which number was the personal cell phone of Morris. Id. at ¶¶ 7, 9. While the average volume of calls at other DOC facilities was about 25 to 50 phone calls a month, 3,576 calls were made from Garner to Morris's number between June 1, 2003, and May 17, 2004. Id. at ¶ 8.

All phone calls from inmates to speed-dial numbers are recorded pursuant to DOC policy. Id. at ¶ 11. Pollard's audit found that the calls to Morris's speed-dial number, which was established in June 2003, were originally recorded; however, the recording feature was disabled on February 10, 2004. Id. at ¶¶ 10-12. Disabling the recording feature requires someone to access the phone system and affirmatively disable it. Id. at ¶ 13.

Pollard's audit results were reported to Lieutenant Gasiorek, the supervisor of the phone monitoring unit of the DOC Security Division. Id. at ¶¶ 4, 14. Based on his report, supervisory staff decided to reactivate the recording feature for Morris's speed-dial number and monitor any calls made to that number. Id. at ¶ 15. From May 17 to May 20, 2004, Lieutenant Valeriano, Officer Pollard, and Lieutenant Gasiorek reviewed a total of forty-four phone calls made to Morris's number, and personally listened to calls made by inmate Duffy to Morris. Id. at ¶¶ 16-19. In these calls, Duffy urged Morris repeatedly to bring him various items, using code words, and the defendants

construed Morris's responses to indicate that Morris was planning on bringing the requested items to Duffy.² Id. at ¶ 23.

After being informed of these phone calls, Dennis Jones, the Director of the Security Division, determined that Security Division representatives would meet Morris on May 22, 2004, to find out if he was bringing contraband into the facility. Id. at ¶¶ 24-25. Such a meeting was arranged by Lieutenant Valeriano, Captain Brighthaupt, and Captain Quiros, who decided they would meet Morris as he entered the Garner facility to start work on that morning. Id. at ¶ 26. Valeriano also arranged for representatives of the Connecticut State Police to be present. Id. at ¶ 27.

On the morning of May 22, 2004, Captain Brighthaupt met Morris in the lobby of Garner and accompanied him to the Warden's private conference room. Id. at ¶ 28. Lieutenant Valeriano, Captain Quiros, and two State Police Troopers were also present in the room. Id. at ¶ 29. Valeriano informed Morris that he was being investigated by the Security Division and had the right to have a union representative present, which Morris initially declined. Id. at ¶¶ 30-31. Morris was asked to empty his pockets, which contained, among other things, a container of chewing tobacco. Id. at ¶¶ 32-33. Valeriano also asked Morris to assume a pat-down position, which he did, and further

---

²The court finds no basis for striking this statement, as Morris requests, see Plf.'s Loc.R.Civ.P. 56(a)2 Statement ("Plf.'s Stat.") at ¶ 23 [Doc. No. 29]. Morris moved to strike it because it "is not an objective fact, but a self-serving statement of opinion." Id. However, the court finds the statement reflects what the defendants heard in the phone calls between Duffy and Morris, and while the observers "translated" some phrases, their experience is a basis on which to do so. See U.S. v. Dukagjini, 326 F.3d 45, 52 (2d Cir. 2003). It bears noting that Morris himself acknowledged at his interview on May 22, 2004 that the conversations included cryptic references to contraband. See Def.'s Stat. at May 22, 2004 Transcript at 13 [Doc. No. 28-8].

told him they intended to search his car. Id. at ¶¶ 34, 37. The entire interaction with Morris in the conference room lasted less than ten minutes. Id. at ¶ 36.

Valeriano and Brighthaupt subsequently searched Morris's car in his presence. Id. at ¶¶ 39-40. Among other things, they found a razor blade that had been shaped into a weapon as well as the photo album of an inmate. Id. at ¶ 41. The search of the vehicle lasted no more than twenty minutes, after which the DOC Security Division proceeded to interview him. Id. at ¶¶ 42-43. After a few questions, Morris requested to have a union representative at the interview, at which point Daniel Gibbs was summoned to appear. Id. at ¶ 45. With his union representative present, Morris admitted that he had a quantity of illegal narcotics locked in his office desk, and a subsequent search of his office revealed small bags of heroin and marijuana. Id. at ¶ 48.[3] Morris also admitted that he did not do any paperwork for these items, although he claimed he advised his supervisor when he was given these items by inmate Duffy. Id. at ¶ 49. DOC Administrate Directive 6.9 requires employees who confiscate or discover contraband to complete an incident report and a chain-of-custody form, and to store the items in an area designated by the Unit Administrator. Id. at ¶ 50. Morris also admitted that he chewed tobacco, and that he gave Duffy "a tiny bit of Skoal . . . that's what the kangaroo pouches [code word] are." Id. at May 22, 2004 Transcript at 13. On June 8, 2004, Morris was interviewed by Captain Quiros about the heroin and

---

[3]Although Morris denies this statement and cites to his Interview Transcript, see Plf.'s Stat. at ¶ 48, without indicating which page number he is referring to, the court cannot determine the reason for his denial. Moreover, in reviewing the Transcript, the court finds that Morris admitted that the defendants' search revealed bags of heroin and marijuana. See Def.'s Stat. at June 8, 2004 Transcript at 3-4.

5

marijuana found in his office desk, with Lieutenant Valeriano present as well as a union representative, Kathy Osten. Id. at ¶¶ 53-55.

Following the May 22, 2004 incident, Morris was sent home and placed on paid administrative leave. Id. at ¶ 57. An employment hearing process was conducted, which resulted in Morris's dismissal for cause on October 18, 2004, based on his violation of various Administrative Directives. Id. at ¶ 58. It was determined that Morris brought contraband to the facility, that he was bringing in items for an inmate, and that he never properly documented the contraband found in his desk. Id. at ¶ 59. Morris appealed his dismissal to an Arbitration Panel, which found on September 23, 2005 that Morris was guilty of misconduct but that suspension, not termination, was the appropriate penalty for the misconduct. Id. at ¶¶ 60-63. Morris returned to his former position; however, the arbitrator ordered that back pay not be given for the period of his suspension. Id. at ¶ 64.

## IV. DISCUSSION

Morris contends that the defendants violated his Fourth Amendment rights by searching his person and car without a warrant and without probable cause, or without reasonable suspicion. The defendants argue that Morris had a diminished expectation of privacy, making the minimally-intrusive search constitutionally permissible, and that they also were justified based on a reasonable suspicion that Morris was planning on bringing contraband into the correctional facility.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It serves to protect people from arbitrary and oppressive

governmental conduct. Michigan v. Tyler, 436 U.S. 499, 504 (1978). However, to find protection under the Fourth Amendment, "an expectation of privacy must be one that society is 'prepared to recognize as legitimate.'" New Jersey v. T.L.O., 469 U.S. 325, 338 (1985) (citations omitted). Moreover, the Fourth Amendment only prohibits conduct that is unreasonable. Carroll v. United States, 267 U.S. 132, 147 (1925); United States v. Paulino, 850 F.2d 93 (2d Cir.1988). "[A]lthough the Fourth Amendment generally requires that a warrant based on probable cause issue before a search occurs, . . . exceptions to this requirement exist where a legitimate governmental purpose makes the intrusion into privacy reasonable." Security and Law Enforcement Employees v. Carey, 737 F.2d 187, 201 (2d Cir.1984) (citing cases). To determine if a search is reasonable, courts are required to engage in "a balancing of the need for the particular search against the invasion of personal rights that the search entail." Bell v. Wolfish, 441 U.S. 520, 559 (1979). That is, courts must analyze "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id.

With respect to the intrusion on the individual's Fourth Amendment interests, the intrusion is to be viewed "in the context of the individual's legitimate expectation of privacy," which includes both the person's actual, subjective expectation of privacy and the expectation that society is prepared to recognize as reasonable. Carey, 737 F.2d at 201 (citing Katz v. United States, 389 U.S. 347, 361 (1967)). In cases involving employees of correctional facilities, courts have held that these employees have diminished expectations of privacy while on correctional facility property. See id. at 202 ("[W]hile it is evident that correction officers retained certain expectations of privacy, it is

7

also clear that based upon the nature of their place of employment and the notice provided by the Department in the rule book at the time of hire [that employees were subject to being searched], their subjective expectations necessarily were diminished significantly."); McDonell v. Hunter, 809 F.2d 1302, 1306 (8th Cir.1987) ("[B]ased on [correctional officers'] place of employment, their subjective expectations of privacy are diminished while they are in the confines of the prison"); Allegheny County Prison Employees Independent Union v. County of Allegheny, 315 F. Supp. 2d 728, 737 (W.D. Pa. 2004), aff'd, 124 Fed. Appx. 140 (3rd Cir. 2005). As for society's expectations, the Second Circuit has found society "is prepared to recognize as reasonable the proposition that correction officers have diminished expectations of privacy in light of the difficult burdens of maintaining safety, order and security that our society imposes on those who staff our prisons. Any contrary conclusion would be unwarranted." Carey, 737 F.2d at 202.

This case law establishes that, as a correctional officer at Garner, Morris's expectations of privacy are diminished. Indeed, DOC Administrative Directive 6.7(8)(B) specifically provides that employees, "at a minimum, may be required to pass through a metal detector or submit to a frisk search when initially entering a facility for reasons reasonably related to security. In addition an employee may be subject to a strip search based on reasonable suspicion that the employee is carrying contraband." See Def.'s Stat. at Morris Dep. at Ex. 3. Directive 6.7(9)(A) provides that all vehicles entering the grounds may be searched, and visitors of Garner are put on notice of this policy by a sign at the entrance stating: "You are now entering a correctional facility. All visitors and vehicles are subject to search by Department of Correction personnel." Id.

at ¶ 65. Morris was aware of this sign. Id. at ¶ 67. Finally, Directive 6.7(9)(B) provides that "[s]earches of privately owned vehicles shall be conducted only with reasonable suspicion." Id. at Morris Dep. at Ex. 3. The defendants clearly had suspicion, based on the monitored telephone calls. Morris has not provided any evidence indicating that he was not aware that he had a diminished expectation of privacy "because [he] work[s] in a jail that requires the implementation of extreme security measures." Allegheny, 315 F. Supp. 2d at 738.

With respect to the need for a particular search, the Second Circuit has recognized "the legitimate penological imperatives of maintaining prison security and preserving internal order and discipline." Carey, 737 F.2d at 203. In fact, "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." Pell v. Procunier, 417 U.S. 817, 823 (1974). Because "[c]orrectional facilities are unique places 'fraught with serious security dangers,' . . . there exists a[n] . . . important governmental interest in controlling the flow of contraband into correctional facilities." Carey, 737 F.2d at 203-4 (citations omitted) (adopting the reasonable suspicion standard, as opposed to the warrant/probable cause requirement, "in the unique context of a correctional setting").

Based on this case law, the court rejects Morris's contention that "the usual Fourth Amendment standards apply to the searches conducted in this case," i.e., a warrant and probable cause, because Morris was not searched "at the point of entry" of the correctional facility. See Plf.'s Memorandum in Opposition to Summary Judgment ("Mem. in Opp.") at 6 [Doc. No. 29]. Morris does not cite to, and the court has not found, any case that distinguishes the specific areas within a correctional facility,

designating the points of entry as having lesser expectations of privacy than places within the facility.[4] As a matter of fact, Carey involved correction officers who were strip searched in the superintendent's office, and not at the point of entry of the facility; nevertheless, the Second Circuit found that such searches "should not be subject to the warrant requirement." 737 F.2d at 204. The court compared visitors to correctional facilities with officers working in them, and found significant parallels between the two:

> First, both categories consist of citizens whom society obviously would recognize as having higher expectations of privacy while outside a correctional facility than while inside. Second, both consist of unincarcerated individuals who may be sources of entry of contraband into inmate populations and thus can pose potential hazards to the correctional facilities' goal of maintaining institutional security. Finally, once they have entered a correctional facility, both have diminished expectations of privacy.

Id. Thus, the court will analyze Morris's Fourth Amendment claim under the reasonable suspicion standard.[5]

"Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable

---

[4]Morris further states that "[t]he defendants have not pointed to a single case in which conduct like theirs was upheld in the face of a judicial challenge." See Plf.'s Mem. in Opp. at 12. However, the defendants cited to Carey, which upheld conduct more intrusive than theirs, i.e., strip searches of correctional officers. Morris does not even cite to Carey in his Memorandum in Opposition, although its holding is clearly controlling to this court.

[5]Although the defendants argue that not even the reasonable suspicion standard controls their search of Morris, because of the absence of "an actual expectation of privacy to be free from the minimally intrusive search performed by the defendants," see Def.'s Memorandum in Support of Summary Judgment ("Mem. in Supp.") at 14 [Doc. No. 28], the court need not address this argument in light of the fact that it finds the defendants' search was justified by reasonable suspicion.

than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990). The reasonable suspicion standard requires consideration of several factors: "(1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof." Carey, 737 F.2d at 205. Reasonable suspicion "must be based on an analysis of all the circumstances as they appeared to the official making the judgment at the time." Nocera v. Rivera, 921 F. Supp. 192, 199 (S.D.N.Y. 1996).

In the case at bar, prior to searching Morris's person and car, the defendants had many objective facts from which they could have reasonably drawn the inference that Morris may have been planning to carry contraband into the correctional facility. A routine audit of the speed-dial system for all DOC facilities had discovered that 3,576 calls were made from inmate phones at Garner to Morris's speed-dial number between June 1, 2003, and May 17, 2004, as compared to an average of between 25 to 50 of such calls per month to other speed-dial numbers. See Def.'s Stat. at ¶¶ 7-9. Moreover, the audit found that the recording feature on Morris's phone was disabled on February 10, 2004, which requires an affirmative act. Id. at ¶¶ 12-13. Finally, three DOC Security Division employees personally listened to calls made by inmate Duffy to Morris between May 17 and May 20, 2004, in which they claim to have heard Duffy urge Morris repeatedly to bring him various items, with Morris responding in a way that, to these individuals, indicated he was planning to bring those items to Duffy. Id. at ¶¶ 20-22. They also claim that they heard code words that they believed were used to disguise the items Duffy and Morris were discussing. Id. at ¶ 23.

11

The court finds these facts sufficient to meet the reasonable suspicion standard. See Carey, 737 F.2d at 205-206. Moreover, the court rejects Morris's argument that the intrusion in this case was far greater than constitutionally permitted. See Plf.'s Mem. in Opp. at 10-11. In Carey, the Second Circuit permitted strip searches of certain correction officers where there was reasonable suspicion to do so. Id. A search of such an intrusive nature having been permitted under the reasonable suspicion standard, the court can find no reason for not constitutionally permitting the brief pat-down search of Morris's outer clothing. Moreover, with respect to the search of Morris's car, the Supreme Court has indicated that a "search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person," Almeida-Sanchez v. U.S., 413 U.S. 266, 279 (1973) (Powell, J., concurring), and that individuals have a diminished expectation of privacy in their car, U.S. v. Chadwick, 433 U.S. 1, 12 (1977). Based on this reasoning, as well as the presence, acknowledged by Morris, of the sign at Garner's entry and the Administrative Directives regarding vehicle searches on prison property, the court finds the search of Morris's car to be constitutionally permissible. It was based on a reasonable suspicion that Morris was bringing contraband into Garner. See supra at 10-11.

Therefore, summary judgment as to the Fourth Amendment search and seizure claim against the defendants is granted.[6]

---

[6] In light of the court's conclusion, it need not address the defendants' qualified immunity defense.

## V. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment [**Doc. No. 28**] is GRANTED. The clerk is ordered to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 25th day of June, 2007.

    /s/ Janet C. Hall
Janet C. Hall
United States District Judge